UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| AMANDA M. ALCALA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Acting Commissioner of the Social ) <br> Security Administration, ) <br> ) <br> Defendant. ) <br> _____) | Case No. SACV 12-0626 AJW <br><br> MEMORANDUM OF DECISION |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"),[1] denying plaintiff's application for disability insurance benefits and supplemental security income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural facts. [See JS 2]. Plaintiff filed applications for disability insurance benefits and SSI benefits on October 13, 2009 and October 20, 2009, respectively, alleging that she had been disabled since September 30, 2009. [Administrative Record ("AR") 26, 93-94, 161, 174]. In a June 10, 2011 written hearing decision that constitutes the Commissioner's final decision

---

[1] Carolyn W. Colvin, who became the Acting Commissioner on February 14, 2013, is substituted for her predecessor Michael J. Astrue. See Fed. R. Civ. P. 25(d).

1  in this matter, an administrative law judge (the "ALJ") found that plaintiff had severe impairments
2  consisting of tachycardia, history of stroke, migraine headaches, and clotting (factor V) deficiency. [AR
3  28, 34]. The ALJ further found that plaintiff retained the residual functional capacity ("RFC") to lift or
4  carry 10 pounds frequently and 20 pounds occasionally; stand or walk for two hours in an eight-hour
5  workday; sit for six hours in an eight-hour workday; occasionally bend, balance, stoop, crawl, and climb;
6  avoid climbing ladders, ropes and scaffolds; and avoid unprotected heights and using dangerous equipment.
7  [AR 29-30]. Relying on the testimony of a vocational expert, the ALJ determined that plaintiff's RFC did
8  not preclude performance of her past work as an escrow clerk. [AR 33-34]. Accordingly, the ALJ
9  concluded that plaintiff not was disabled at any time through the date of his decision. [AR 26, 34].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)).

## Discussion

**Treating source opinions**

Plaintiff contends that the ALJ erred in rejecting the opinions of her treating physicians, Madhavi Mummaneni, M.D., Amar Shokrae, M.D., and Mike Vasilomanolakis, M.D. [JS 8-13].

On January 5, 2008, plaintiff went to the emergency room at St. Joseph Hospital after experiencing chest pain for the preceding two days following a fall at her home. [AR 418-419]. She was subsequently

1  admitted to the hospital and underwent a CT angiogram of the chest that showed evidence of multiple
2  pulmonary emboli. [AR 419, 692, 705-706]. She was treated with Coumadin[2] and discharged three days
3  later with instructions to follow up with Dr. Mummaneni, her treating specialist in hematology and oncology
4  at the Hematology-Oncology Medical Group of Orange County, Inc. [AR 414, 645-649, 651].

5  Dr. Mummaneni diagnosed plaintiff with hypercoagulable state or factor V Leiden deficiency based
6  on genetic testing.[3] He switched plaintiff from Coumadin to Lovenox because she was pregnant. [AR 408,
7  651, 686, 692-695]. Plaintiff continued to see Dr. Mummaneni every two to four weeks through May 2010.
8  [AR 31, 645-649, 656, 664, 680-682, 685, 688-691, 697, 782-789, 794-797].

9  In April 2008, plaintiff told Dr. Mummaneni she was feeling "ok" but had noticed an increase in
10 migraine headaches. Plaintiff told Dr. Mummaneni in August 2008 that she had been experiencing
11 occasional shortness of breath and a heavy sensation in her abdomen. [AR 688]. She sought treatment in
12 the emergency room for shortness of breath and chest pain on August 12, 2008. [AR 383-384, 686, 688-
13 689, 870]. A CT scan showed no blood clots at that time. [AR 688].

14 On October 6, 2008, plaintiff gave birth to her son. [AR 566-568]. On October 10, 2008, she
15 underwent surgery to treat a wound hematoma at the site of her cesarean section. [AR 569-570].

16 Plaintiff saw Dr. Vasilomanolakis, a cardiologist, at the Community Hospital of Long Beach, every
17 four to six months from November 2007 to October 2009 for her tachycardia and other cardiac problems.
18 [AR 740, 867-871, 875-878, 880-887, 1050-1055]. On February 17, 2009, Dr. Vasilomanolakis noted that
19 plaintiff had missed her "last couple of appointments[,]" but explained that she missed that last one because
20 she was involved in a motor vehicle accident. [AR 869]. In addition, he noted that she underwent a

---

[2] Coumadin (warfarin) is used to prevent blood clots from forming or growing larger in the blood and blood vessels. It is prescribed for certain types of irregular heartbeat, people with prosthetic heart valves, and heart attack victims. See United States National Library of Medicine and National Institutes of Health, PubMed Health website, Coumadin, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001928 (last visited Mar. 26, 2013).

[3] Factor V Leiden is a mutation of one of the clotting factors in the blood called factor V. This mutation can increase the chance of developing abnormal blood clots (thrombophilia), usually in the veins. Women may have an increased tendency to develop blood clots during pregnancy or when taking the hormone estrogen. Some people with Factor V Leiden develop clots that lead to long-term health problems or become life-threatening. Mayo Clinic website, Factor V Leiden, at http://www.mayoclinic.com/health/factor-v-leiden/DS01083 (last accessed April 8, 2013).

3

cesarean section on October 6, 2008 and "4 days later, just prior to discharge, she was known to have a sizable incisional hematoma and was rushed back to surgery." [AR 869].

On February 23, 2009, and July 13, 2009, plaintiff reported to Dr. Mummaneni that she was experiencing left arm pain. [AR 678-679].

On September 23, 2009, plaintiff experienced sudden vertigo with nausea and vomiting. She was taken to Huntington Beach Hospital, where she presented with an altered mental state. [AR 473, 478, 664]. Plaintiff was diagnosed as having suffered a stroke. [AR 651, 782]. An MRI of the brain confirmed the presence of a subacute infarction involving the cerebellar vermis. [AR 670-671, 673-674]. Dr. Shokrae, a neurologist at the Pavilion Neurology Medical Group, Inc., saw plaintiff for treatment of her stroke symptoms every two to four months from September 2009 to August 2010. [AR 734-735, 741-742, 889-894].

Dr. Vasilomanolakis completed an undated Cardiac Impairment Questionnaire noting that he last examined plaintiff on October 1, 2009, and that she had a New York Heart Association functional classification of three.[4] Her prognosis was fair. [AR 1050]. He identified the following clinical findings to support his diagnosis: chest pain, shortness of breath, fatigue, palpitations, and dizziness/syncope. [AR 1050]. Dr. Vasilomanolakis explained that his assessment was supported by a cardiac event recorder showing a supraventricular tachycardia rate of 300 beats per minute and an MRI showing a clot to the cerebellar vermis. [AR 1051]. Plaintiff's primary symptoms included dizziness, palpitations, shortness of breath, and chest pain in the left lower chest that occurred when she breathed deeply or had palpitations. [AR 1051]. Plaintiff was taking Coumadin to treat her condition. Dr. Vasilomanolakis noted that plaintiff's symptoms would likely increase if she were placed in a competitive work environment. [AR 1052]. He opined that plaintiff could sit for up to four hours in an eight-hour workday, stand or walk for up to two

---

[4] The New York Heart Association functional classification system is "the most commonly used" system for classifying the severity of a patient's symptoms of heart failure. Patients are placed in classes I through IV, in ascending order of severity, "based on how much they are limited during physical activity." Class III refers to patients "with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea [shortness of breath] or anginal pain." See http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last accessed April 8, 2013).

4

hours in an eight-hour workday, and occasionally lift and carry up to 20 pounds. [AR 1052-1053]. He also stated that plaintiff's impairments would likely cause her to miss work two or three times a month, periodically interfere with her attention and concentration, and would limit her to a low stress work environment. [AR 1053]. Dr. Vasilomanolakis added that plaintiff has psychological limitations that would affect her ability to work at a regular job, should avoid humidity, and is precluded from kneeling, bending and stooping. [AR 1054].

On October 13, 2009, plaintiff underwent a transesophageal echocardiogram that showed a mild tricuspid valve prolapse with mild to moderate tricuspid insufficiency and a suspicious very small membranous ventriculoseptal defect with a trickle of shunt going across from left to right. [AR 877].

On October 28, 2009, plaintiff went to the emergency room at St. Joseph Hospital complaining of a severe headache that began the day before causing nausea and sensitivity to light. A CT scan of her head was normal. [AR 1153-1155]. On October 31, 2009, plaintiff returned to the emergency room for facial numbness and speech difficulty. [1143-1146].

On January 29, 2010, plaintiff went to the emergency room again complaining of a headache that began two days before, slurred speech, and blurred spotty peripheral vision. [AR 1133]. A CT scan of her head was normal. [AR 1136].

On February 2, 2010, Sarah L. Maze, M.D., performed a neurological evaluation of plaintiff on behalf of the Commissioner, but did not review any medical records. [AR 603-606]. Her exam revealed decreased strength in plaintiff's left upper extremity. [AR 604-605]. Dr. Maze opined that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently. [AR 605]. She also indicated that plaintiff could stand or walk for up to four hours in an eight-hour workday and sit for up to six hours in an eight-hour workday. [AR 605].

On March 25, 2010, plaintiff returned to the emergency room at St. Joseph Hospital complaining of a headache and neck pain. [AR 1129]. She also reported that the day before she had experienced a headache, vomiting, and poor memory. [AR 1129].

On May 25, 2010, Dr. Mummaneni completed a Multiple Impairment Questionnaire indicating that he last examined plaintiff on April 5, 2010, less than two months earlier. Plaintiff had a diagnosis of hypercoagulable state, and her prognosis was guarded. [AR 782]. He stated that his diagnosis was

supported by plaintiff's history of deep vein thrombosis in the left upper extremity, pulmonary embolism, and stroke. [AR 782]. Dr. Mummaneni cited diagnostic tests supporting his diagnosis, including an MRI of the brain, a CT scan of the chest with angiogram, and genetic testing. [AR 783]. Dr. Mummaneni also stated that plaintiff experiences a dull, throbbing, constant pain in her left arm, dizziness, and migraine headaches. [AR 783]. He rated plaintiff's pain level as moderate to moderately severe and her fatigue as moderately severe to severe, but noted that plaintiff's pain was relieved with medication. [AR 784]. Dr. Mummaneni opined that plaintiff could sit for up to two hours in an eight-hour day, stand or walk for up to one hour in an eight-hour day, and must be able to get up and move around every one to two hours for 30 minutes to an hour before sitting back down. [AR 784-785]. Plaintiff would also need to take unscheduled breaks every one to two hours lasting up to one hour at a time and would likely miss work more than three times a month due to her impairments. [AR 787-788]. Plaintiff could lift 10 pounds frequently and 20 pounds occasionally, and would be unable to kneel or stoop. She was moderately limited in her ability to grasp, turn or twist objects, reach, and use her fingers or hands for fine manipulation. [AR 785-786]. Dr. Mummaneni stated that plaintiff needs to avoid noise and temperature extremes. [AR 788]. He indicated that plaintiff's medications include Coumadin, Antivert,[5] Vicodin[6] and promethazine,[7] and that Antivert causes dizziness and nausea and promethazine causes sleepiness. [AR 786]. Dr. Mummaneni also said that plaintiff's symptoms would likely increase if she were placed in a competitive work environment.

---

[5]  Antivert (meclizine) is used to treat motion sickness and dizziness. Antivert belongs to a class of drugs called antihistamines. See United States National Library of Medicine and National Institutes of Health, PubMed Health website, Antivert, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011054 (last accessed Mar. 26, 2013).

[6]  Vicodin is the brand name for a combination of hydrocodone, an opioid pain medicine, and the analgesic acetaminophen. Vicodin is used for the relief of moderate to moderately severe pain. See Abbott Laboratories, Vicodin website, available at http://www.vicodin.com/patient/index.cfm (last accessed Mar. 26, 2013).

[7]  The generic drug promethazine is an antihistamine that is used to relieve or prevent the symptoms of hay fever, allergic conjunctivitis (inflammation of the eye), and other types of allergy or allergic reactions Promethazine is also used to prevent and control motion sickness, nausea, vomiting, and dizziness. In addition, it may be used to help people go to sleep and control their pain or anxiety before or after surgery or other procedures. See United States National Library of Medicine and National Institutes of Health, PubMed Health website, Promethazine, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001506 (last accessed Mar. 26, 2013).

Her condition interfered with her ability to keep her neck in a constant position, and her pain, fatigue and other symptoms would constantly interfere with her attention and concentration. [AR 786-787]. In addition, Dr. Mummaneni opined that symptoms of anxiety and depression affected plaintiff's ability to work, and that she could tolerate only low work stress. [AR 787].

On January 8, 2011, Dr. Shokrae completed a Headaches Impairment Questionnaire and indicated that he last treated plaintiff on August 31, 2010. [AR 888-889]. He stated that plaintiff's diagnoses include refractory migraine headaches, cerebellar infarction, cardiac arrhythmia, pulmonary embolism, and cognitive impairment. [AR 889]. Her prognosis was fair, "but [her] condition is not responding to medication." [AR 889]. Dr. Shokrae described plaintiff's migraines as "severely intense" with associated symptoms of vertigo, nausea/vomiting, photosensitivity, visual disturbances, mood changes, and mental confusion/inability to concentrate. [AR 890]. He explained that plaintiff's headaches occur daily or weekly, last one to five days, and are triggered by alcohol, bright lights, caffeine, noise, strong odors, lack of sleep, menstruation, stress, vigorous exercise, hunger, and weather changes. [AR 890-891]. Bright lights, stress, coughing, straining, moving around, and noise can worsen her headaches, and he instructed plaintiff to rest in a dark quiet room when suffering a migraine. [AR 891]. Dr. Shokrae further explained that plaintiff's treatment has included abortive and preventative medications, including Vicodin, Antivert, and Topamax[8], but they have failed to resolve her symptoms. [AR 892]. He opined that plaintiff's symptoms frequently interfere with her attention and concentration and she is incapable of tolerating even a low stress work environment. [AR 892-893]. According to Dr. Shokrae, plaintiff's headaches would preclude her from performing even basic work activities and would likely cause her to miss work more than three times a month. [AR 893]. Finally, he opined that plaintiff should avoid noise, fumes, gasses, temperature extremes, humidity, dust and heights, and that she should not push, pull, kneel, bend, or stoop. [AR 893].

In a letter dated April 3, 2011, Dr. Vasilomanolakis stated that he had not examined plaintiff since October 1, 2009, because she had a change in insurance, and he did not know her physical status as of the

---

[8] Topamax (topiramate) is an anticonvulsant that is used alone or together with other medicines to help control certain types of seizures and to help prevent migraine headaches in adults. See United States National Library of Medicine and National Institutes of Health, PubMed Health website, Topamax, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012471 (last accessed Mar. 26, 2013).

1  date of the letter. [AR 1061-1062]. However, in light of her impairments, including a congenital clotting
2  disorder that will require lifelong anticoagulation, he opined that "she will have difficulty performing any
3  full time work[.]" [AR 1062-1063].
4      At the hearing on May 11, 2011, the medical expert, Arnold Ostrow, M.D., testified that plaintiff's
5  medically determinable impairments include super ventricular tachycardia, status post ablation therapy;
6  factor V clotting deficiency, status post multiple pulmonary emboli; history of stroke; and panic attacks.
7  [AR 81]. Dr. Ostrow opined that plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and
8  that he could stand or walk for two hours, and sit for six hours, in an eight-hour workday. [AR 82]. Plaintiff
9  could occasionally bend, balance, stoop, crawl and climb stairs, and is precluded from climbing ropes,
10 ladders, and scaffolding; work at unprotected heights; and using dangerous equipment. [AR 82]. In
11 response to questions from plaintiff's counsel, Dr. Ostrow conceded that plaintiff's medications for
12 migraines could cause difficulty with concentration and memory. [AR 84].
13     After reviewing the medical evidence, the ALJ explained that he gave "little weight" to Dr.
14 Mummaneni's opinion because it was "not supported by objective findings either from his own notes or
15 from any treating or examining source." [AR 31]. He also found that Dr. Mummaneni's opinion was
16 "undermined by the clinical findings and opinion of" the consultative examiner, Dr. Maze, and was
17 "contradicted by the opinion of the medical expert," Dr. Ostrow, "who had the opportunity to reviewed [sic]
18 the entire record, including updated records that allowed him to give a more accurate analysis of the
19 claimant's functioning." [AR 31]. In addition, the ALJ stated that he gave "little weight" to Dr. Shokrae's
20 January 8, 2011, opinion because it was generated "14 months after the most recent examination in
21 September 2009." [AR 31-32]. Further, the ALJ concluded that Dr. Shokrae's opinion regarding plaintiff's
22 functional capacity was "speculative in nature[,]" and was undermined by Dr. Maze's more recent
23 consultative opinion and the medical expert's findings. [AR 32]. The ALJ similarly gave Dr.
24 Vasilomanolakis's opinion "little weight" because it was generated 18 months after his most recent exam,
25 was speculative in nature, and was undermined by the opinions of Dr. Maze and the medical expert. [AR
26 32]. Finally, the ALJ said that he gave "significant weight" to the medical expert's opinion because it was
27 consistent with Dr. Maze's opinion. [AR 33].
28     A treating physician's opinion is not binding on the Commissioner with respect to the existence of

an impairment or the ultimate issue of disability. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). However, a treating physician's medical opinion as to the nature and severity of an individual's impairment is entitled to controlling weight when that opinion is well-supported and not inconsistent with other substantial evidence in the record. Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001); Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); see 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *1-*2. Even when not entitled to controlling weight, "treating source medical opinions are still entitled to deference and must be weighed" in light of (1) the length of the treatment relationship; (2) the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the supportability of the diagnosis; (5) consistency with other evidence in the record; and (6) the area of specialization. Edlund, 253 F.3d at 1157 & n.6 (quoting SSR 96-2p and citing 20 C.F.R. § 404.1527); Holohan, 246 F.3d at 1202.

If a treating source opinion is uncontroverted, the ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting it. If contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan, 242 F.3d at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).[9]

In order for an examining physician's opinion to amount to substantial evidence, it must be based on "independent clinical findings," which "can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, or (2) findings based on objective medical tests that the treating physician has not herself considered." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (internal citations omitted).

Dr. Maze examined plaintiff in February 2010. [AR 603-606]. Dr. Maze did not review any of plaintiff's medical records, nor did he have the benefit of any diagnostic studies. [AR 603-606]. Moreover, despite finding that plaintiff had decreased strength in her left upper extremity, Dr. Maze found no

---

[9] The Commissioner contends that under his regulations, which are "entitled to deference," an ALJ "must give good reasons" supported by substantial evidence for rejecting or discounting a treating physician's opinion. [JS 14]. This Court, however, is bound by Ninth Circuit law, and therefore the merits of the Commissioner's contention are not addressed.

limitations in plaintiff's ability to use her hands. [AR 604-605]. Dr. Maze did not include any diagnoses other than noting that plaintiff suffered a stroke and has suffered from headaches, made no findings based on objective medical tests that plaintiff's treating doctors did not consider, and did not review any of plaintiff's diagnostic studies or perform any of his own. Thus, Dr. Maze's contrary opinion does not rise to the level of substantial evidence justifying rejection of the treating physicians' opinions. Finally, because Dr. Ostrow's opinion contradicts all of plaintiff's treating physicians' opinions and is only consistent with the opinion of Dr. Maze, it cannot, standing alone, constitute substantial evidence. Erickson v. Shalala, 9 F.3d 813, 818 n.7 (9th Cir. 1993) ("the non-examining physicians' conclusion, *with nothing more*, does not constitute substantial evidence[]") (internal quotation marks, brackets and citation omitted) (italics in original).

The ALJ erred in rejecting the opinions of treating physicians Drs. Mummaneni, Shokrae, and Vasilomanolakis in favor of the conflicting opinion of Dr. Maze, the consultative examining neurologist, and Dr. Ostrow, the non-examining medical expert. [AR 31-33]. The treating physicians' opinions are well-supported, consistent with the record as a whole, reflect a longitudinal knowledge of plaintiff's condition gained from regular treatment appointments over an extended period, and are based on their expertise in relevant medical specialties. Thus, their opinions were entitled to deference, and the ALJ's reasons for rejecting them are not specific and legitimate or supported by substantial evidence in the record. See Orn, 495 F.3d at 632-634; see also 20 C.F.R. § 404.1527(d).

For example, the ALJ rejected Dr. Mummaneni's opinion on the basis that it was "not supported by objective findings[.]" [AR 31]. Such a conclusory assertion by the ALJ does not reach the level of specificity required in order to reject the opinion of a treating physician. See Embrey v. Bowen, 849 F.2d 418, 421-423 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim. The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the [treating] doctors', are correct.") (footnote omitted); see also McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989) (holding that rejecting the treating physician's opinion on the ground that it was contrary to clinical findings in the record was "broad and vague, failing to specify why

10

the ALJ felt the treating physician's opinion was flawed"). In any event, the ALJ's assertion is not supported by the record. As discussed above, Dr. Mummaneni examined plaintiff every two to four weeks for over two years and based his opinion of plaintiff's functional limitations on his treatment of plaintiff and objective diagnostic test results including an MRI of plaintiff's brain, a CT angiogram of her chest and the results of genetic testing. [AR 31, 645-649, 656, 664, 680-682, 685, 688-691, 697, 782-789, 794-797].

The ALJ also rejected Dr. Vasilomanolakis's diagnosis of the New York Heart Association functional classification of Class III as not objectively supported in the record. [AR 32]. Yet, as discussed above, Dr. Vasilomanolakis's diagnosis was based on his treatment of plaintiff for nearly two years, and the objective results of a cardiac event recorder and an MRI of plaintiff's brain. [AR 462-463, 872-883, 1050-1055].

The ALJ also rejected all three of the treating doctor's opinions on the ground that they were contradicted by the opinions of the examining physician and the non-examining medical expert. [AR 31-32]. That a treating physician's opinion is contradicted means only that the ALJ must provide specific and legitimate reasons, rather than clear and convincing reasons, supported by substantial evidence for rejecting that doctor's opinion. It does not, in and of itself, constitute a valid reason for discounting the treating physician's opinion. See Batson, 359 F.3d at 1195; Tonapetyan, 242 F.3d at 1148-1149; Lester, 81 F.3d at 830-831.

The ALJ also rejected Dr. Shokrae's opinion in part because it was rendered 14 months after his most recent exam of plaintiff in September 2009, and because Dr. Maze's February 2, 2010, opinion was more recent in time. [AR 32]. The ALJ was mistaken. Dr. Shokrae's January 8, 2011 opinion post-dated his most recent examination of plaintiff on August 31, 2010 by only four months, not 14 months, making Dr. Shokrae's opinion more recent in time than that of Dr. Maze. This means that two of the ALJ's reasons for giving Dr. Maze's opinion more weight than Dr. Shokrae's opinion were not supported by the record. [AR 734-735, 889-894]. See Reddick v. Chater, 157 F.3d 715, 722-723 (9th Cir. 1998) ("In essence, the ALJ developed his evidentiary basis by not fully accounting for the context of materials or all parts of the testimony and reports. His paraphrasing of record material is not entirely accurate regarding the content or tone of the record."); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) ("Although it is within the power of the [Commissioner] to make findings . . . and to weigh conflicting evidence, he cannot reach a

conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result.") (citation omitted).

In addition, the ALJ rejected Dr. Vasilomanolakis's undated opinion in part because that physician said that he last examined plaintiff in October 2009 and was unaware of plaintiff's condition subsequent to that date. [AR 32]. While it is true that Dr. Vasilomanolakis said that he had not examined plaintiff since October 2009 due to a change in her insurance, this does not constitute a valid reason for discounting his opinion of her impairments as of October 2009, when he was still treating her and had been doing so for almost two years.

Finally, the ALJ described the opinions of both Dr. Shokrae and Dr. Vasilomanolakis as "speculative." [AR 32]. Yet, as discussed above, those doctors treated plaintiff over the course of nearly one year and two years, respectively, and their opinions are supported by clinical findings and objective diagnostic testing. [AR 734-735, 740-742, 867-871, 875-878, 880-887, 889-894, 1050-1055]. Under these circumstances, the ALJ's assertion that both opinions were "speculative" is not a legitimate reason for giving more weight to the opinions of Dr. Maze, who examined plaintiff once and reviewed no medical records, or to the opinions of the non-examining state agency physician.

In sum, the ALJ committed legal error by failing to articulate specific, legitimate reasons based on substantial evidence for rejecting the treating source opinions of Drs. Mummaneni, Shokrae, and Vasilomanolakis.

**Remedy**

The choice whether to reverse and remand for further administrative proceedings, or to reverse and simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.) (holding that the district court's decision whether to remand for further proceedings or payment of benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S. 1038 (2000). The Ninth Circuit has adopted the "Smolen test" to determine whether evidence should be credited and the case remanded for an award of benefits:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the

claimant disabled were such evidence credited. Harman, 211 F.3d at 1178 (quoting Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996)). Where the Smolen test is satisfied with respect to the evidence in question, "then remand for determination and payment of benefits is warranted regardless of whether the ALJ might have articulated a justification for rejecting" the improperly discredited evidence. Harman, 211 F.3d at 1179; Varney v. Secretary of Health & Human Servs., 859 F.2d 1396, 1400-1401 (9th Cir. 1988).

The ALJ did not meet his burden to articulate legally sufficient reasons for rejecting all three of plaintiff's treating source opinions. See Lester, 81 F.3d at 834 (stating the general rule that the improperly discredited opinion of a treating or examining physician is credited as true as a matter of law); see also Harman, 211 F.3d at 1179 (explaining that even if there are grounds on which the ALJ could legitimately have relied to reject a treating physician's opinion, the "crediting as true" rule is warranted in order to improve the performance of ALJs by requiring them to articulate those grounds in the original decision and to discourage them from reaching a conclusion first, and then attempting to justify it by ignoring competent evidence). Therefore, Dr. Mummaneni's May 2010 impairment questionnaire, Dr. Shokrae's January 2011 impairment questionnaire, and Dr. Vasilomanolakis's undated questionnaire are credited as true as a matter of law. See Edlund, 253 F.3d at 1160 (crediting, as a matter of law, improperly rejected treating physician opinions).

As previously discussed, Dr. Mummaneni and Dr. Shokrae both opined that plaintiff's impairments would, among other things, cause to her to be absent from work more than three times a month.[10] [AR 788, 893]. The vocational expert testified that plaintiff would be unable to perform her past relevant work if she would miss at least three days of work a month. [AR 91]. Crediting the treating doctors' opinions that plaintiff would miss more than three days a month means that an award of benefits is appropriate in this case. See Benecke, 379 F.3d at 595 ("[I]n the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy, even though the vocational expert did not address the precise work limitations established by the improperly discredited [evidence], remand for an immediate award of benefits is appropriate."); see also Brewes v. Comm'r of Social Sec.

---

[10] Dr. Vasilomanolakis opined that plaintiff's impairments would cause her to miss work two to three times a month. [AR 1053].

Admin., 682 F.3d 1157, 1164-1165 (9th Cir. 2012) (reversing for an award of benefits where the record as a whole showed that the claimant was likely to miss multiple days of work per month, and the vocational expert testified that a person who would miss two days of work a month was not employable); Watson v. Barnhart, 2003 WL 21838474, at *1 (N.D. Cal. Aug. 1, 2003) (noting the vocational expert's testimony that the claimant "could not work in any gainful employment if she had to miss more than three days of work a month"), aff'd, 126 Fed.App'x 788 (9th Cir. Mar. 8, 2005); Wright v. Astrue, 2009 WL 2827576, at *8 (D. Or. Aug. 24, 2009) (noting the vocational expert's testimony that the claimant "could not perform competitive employment if she had to miss more than two days of work a month on a routine basis[]"); Harsh v. McMahon, 2007 WL 675494, at *3 (D. Kan. Feb. 26, 2007) (noting the vocational expert's testimony that "missing two or three or more work days a month would preclude any kind of work activity[]").

Because the record is fully developed and crediting the opinions of Dr. Mummaneni, Dr. Shokrae, and Dr. Vasilomanolakis would result in a finding that plaintiff is precluded from engaging in substantial gainful activity, remanding this case to the Commissioner would serve no useful purpose. See Benecke, 379 F.3d at 595 ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."). Moreover, plaintiff has already waited over three years for a disability determination. [See AR 26, 93-94]. See Benecke, 379 F.3d at 595 ("Remanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.") (citation and internal quotation marks omitted).[11]

///
///
///

---

[11] This disposition makes it unnecessary to consider plaintiff's remaining contention that the ALJ impermissibly rejected her subjective allegations. [See JS 18-22].

14

**Conclusion**

For the reasons stated above, the Commissioner's decision is **reversed**, and the case is **remanded** for an award of benefits consistent with this memorandum of decision.

**IT IS SO ORDERED.**

April 15, 2013

_____
ANDREW J. WISTRICH
United States Magistrate Judge